UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHEYENNE GREGGS,

               Plaintiff,                        Case No. 1:13-cv-1130

v.                                              Hon. Robert J. Jonker

ANDREWS UNIVERSITY, *et al.*,

               Defendants.

_____/

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a *pro se* plaintiff, Cheyenne Greggs. Plaintiff's claim arose from a series of events which occurred in 1996 and 1997 which resulted in his expulsion from Andrews University (sometimes referred to as "the University"). This matter is now before the Court on defendant Andrews University's motion to dismiss plaintiff's third amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) (docket no. 26), because the action is barred by the statute of limitations and the doctrine of res judicata.

### I.      Background

Plaintiff's case has a lengthy history spanning nearly 18 years and includes two previous unsuccessful lawsuits against Andrews University filed in the Michigan state courts. Andrews University relies in part on the opinions and orders entered in those previous cases. *See Buck v. Thomas M. Cooley Law School*, 597 F.3d 812, 816 (6th Cir. 2010) ("[a]lthough typically courts are limited to the pleadings when faced with a motion under Rule 12(b)(6), a court may take judicial notice of other court proceedings without converting the motion into one for summary judgment").

In *Greggs v. Andrews University*, No. 234627, 2003 WL 1689619 (Mich. App. March 27, 2003), the Michigan Court of Appeals set out the factual basis of plaintiff's ongoing dispute with Andrews University:

> Andrews University is a private, religious college located in Berrien Springs, which the Seventh-day Adventist Church founded. For the 1996-1997 school year, Andrews University published a student handbook outlining the school's policies. The handbook included a section entitled "Freedom from Harassment," which listed the school's "Policy Statement on Discrimination and Harassment Including Sexual Harassment." While this policy mainly dealt with employment-related harassment and harassment tied to education, it also provided a basic description of the school's view of sexual harassment:
>
>> It is the policy of Andrews University to provide an educational and employment environment free from all forms of intimidation, hostility, offensive behavior and discrimination, including sexual harassment. Such discrimination or harassment may take the form of unwarranted verbal or physical conduct, verbal or written derogatory or discriminatory statements. . . .
>>
>> * * *
>>
>> A student who believes that he or she has been discriminated against or harassed should report the conduct to the chairperson of the department to which the teacher is assigned, and if the chairman is the aggrieving party, to the dean of the college/school in which he or she is enrolled.
>
> The handbook also included a separate section concerning "Code Violations," explaining:
>
>> Students are expected to conduct themselves at all times in a manner that is honest and is consistent with the traditions and beliefs of the Seventh-day Adventist Church. Students may be disciplined for conduct that is hazardous to the health, safety or well-being of members of the university community; is incompatible with Biblical standards of morality as interpreted by the Seventh-day Adventist Church; or is detrimental to the university's interested whether such conduct occurs on or off campus or at university-sponsored events.
>>
>> It is a voted policy of the University that in interpretation of University policies the ruling of the President shall prevail. She/he

2

or the vice-President for Student Services may clarify any disciplinary policy by making a ruling thereon.

Dismissal or suspension from the University or lesser disciplinary action may result from the commission of any of the following offenses or violations:

\* \* \*

2. Violation of Biblical teaching of sexual morality.

\* \* \*

7. Sexual abuse, date/acquaintance rape, or any form of sexual harassment. . . .

In 1996, while Greggs was a graduate student at Andrews University living in a school dormitory, another male student, "John Doe," accused him of sexual assault. Greggs denied that he participated in any assault, and strenuously contested the implication that he was homosexual. However, the alleged assault, which reportedly did not occur on the Andrews University campus, spawned an investigation by the University's Sexual Harassment Committee, which sent its written findings to Greggs:

On January 7, 1997, allegations of sexual misconduct were officially reported to Hoilette [Vice-President of Student Services]. It was at that time that [John Doe] accused Paul Flyger and Cheyenne Greggs of raping him some time in August of 1996. Dr. Hoilette appointed this Sexual Harassment Committee to investigate the complaint according to the formal procedure outlined in the Andrews University Policy Handbook, policy # 3:273:5:3. After careful consideration of the incidents as reported by [John Doe], Paul Flyger and Cheyenne Greggs, and after reviewing the written reports, interviewing the parties involved, listening to audio tapes presented to the committee, and after assessing the credibility of the parties involved accordingly, the Sexual Harassment Committee finds that:

1) [John Doe] indeed was a victim of unwelcome sexual advances and unwelcome sexual demands for an intimate physical encounter forced on him by both Paul Flyger and Cheyenne Greggs.

2) [John Doe] was the victim, Paul Flyger the aggressor, and Cheyenne Greggs not only a participant, but also a facilitator and

orchestrator of the first incident which reportedly took place some time in August of 1996.

Andrews University eventually expelled Greggs, forcing him to move out of the school dormitory.

*Greggs*, 2003 WL 1689619 at *1-2 (brackets in original) (footnotes omitted).

In its supporting brief, Andrews University summarized plaintiff's two Michigan lawsuits which arose from his 1997 expulsion.

A. Mr. Greggs' First Lawsuit Against Andrews University

Some time before March 24, 1997, Mr. Greggs, through his attorney, filed a Complaint against Andrews University, together with a Petition for Ex Parte Interim Order, asking the court to stop Andrews University from evicting him. On March 24, 1997, Judge Lynda Tolen of the Berrien County [5th] District Court ordered Andrews University not interfere with Mr. Greggs' possession of his residence. *See* March 24, 1997 Order attached as Exhibit A [docket no. 27-1 at pp. ID# 310-12]. Upon receipt of this *ex parte* order, Andrews University immediately filed a motion asking Judge Tolen to rescind her order since landlord-tenant laws do not apply to student dormitories. Following an April 4, 1997 hearing on the matter, Judge Tolen ordered that her previous order be rescinded and set aside. *See* April 4, 1997 Order attached as Exhibit B [docket no. 27-1 at pp. ID# 313-15]. Andrews University was permitted to force Mr. Greggs out of its student residence hall since Mr. Greggs was no longer a student.

B. Mr. Greggs' Second Lawsuit Against Andrews University

Approximately one year later, on or about March 19, 1998, Mr. Greggs, again through his attorney, filed a second action against Andrews University, this time complaining that Andrews University defamed him and intentionally inflicted emotional distress on him when the University investigated a complaint against him brought by another student, concluded that Mr. Greggs was "not only a participant, but also a facilitator and orchestrator" of an unwelcome intimate physical encounter between two male students, and dismissed him from the University. See Summons and Complaint attached as Exhibit C [docket no. 27-2 at pp. ID# 316-20].

After three years of litigation, Judge Paul Maloney, then of the Berrien County Circuit Court, granted Andrews University's motion for summary disposition and dismissed Mr. Greggs' lawsuit with prejudice. See May 15, 2001 Order attached as Exhibit D [docket no. 27-2 at pp. ID# 321-22]. A few months later, Judge

4

Maloney ordered that Andrews University be granted mediation sanctions because Mr. Greggs unsuccessfully pursued his lawsuit despite a mediation panel's unanimous finding that Mr. Greggs' lawsuit was "Frivolous." <u>See</u> October 3,2001 Order attached as Exhibit E [docket no. 27-3 at pp. ID# 323-24].

Defendant's Brief (docket no. 27 at pp. ID# 297-98).

In affirming the dismissal of plaintiff's second lawsuit, the Michigan Court of Appeals explained in pertinent part:

[I]n March 1998, Greggs sued Andrews University, alleging defamation and intentional infliction of emotional distress. According to the complaint, the statements in the Sexual Harassment Committee's letter to Greggs indicating that he was "guilty of 'making unwelcome sexual advances and unwelcome sexual demands for an intimate physical encounter forced' on" Doe were false. Likewise, the statement that Greggs "was 'not only a participant, but also a facilitator and orchestrator of the first incident' " was false. All these statements led to the false inference that Greggs was homosexual. The complaint added that Andrews University had published these falsehoods when its employee, a security guard, reported the alleged assault to the Berrien Springs Police Department. The complaint asserted that Assistant Dean of Men, Spencer Carter, had published the statements when Carter "told students that the Plaintiff [Greggs] had been expelled from Andrews for being a homosexual and for raping another male student," and that fellow student and residence hall advisor Dean Vincent David "told students that the Plaintiff [Greggs] was an immoral person" and "had unnatural affection and had been involved in a rape." Greggs again emphasized that these statements were false, and claimed that Andrews University knew these statements to be false when they were made. Greggs asserted that there was no privilege for these statements. As damages, Greggs claimed that he suffered "emotional distress," "humiliation, mortification, and embarrassment," "sleeplessness and anxiety," "[m]oving [c]ost[s]," "loss of time from studies," and other damages.

In support of his intentional infliction of emotional distress claim, Greggs incorporated by reference the allegations related to his defamation claim. He added that Andrews University acted intentionally, and that those actions were "extreme, outrageous, and of such character as not to be tolerated by a civilized society." Greggs asserted that Andrews University engaged in this conduct for an unspecified "ulterior motive," leading to his "severe and serious emotional distress." He cited the same damages he named in his claim for defamation.

*Greggs*, 2003 WL 1689619 at *2-3 (brackets in original) (footnotes omitted). The Michigan Court of Appeals affirmed the trial court's dismissal of plaintiff's complaint. *Id.* at *13. Plaintiff filed an

5

application for leave to appeal to the Michigan Supreme Court, which that court denied.  *Cheyenne Greggs v. Andrews University*, 469 Mich. 908, 670 N.W.2d 218 (Sept. 29, 2003).

After the dismissal of his second state lawsuit against Andrews University, plaintiff turned his attention to threatening legal action against employees of Andrews University.  In a letter dated June 5, 2005, addressed to 19 Andrews University administrators and professors entitled "RE: FRAUDULENT CONCEALMENT, VIA A CONSPIRACY TO VIOLATE, ON-GOING, THE FEDERAL CONSTITUTIONAL RIGHTS OF CHEYENNE GREGGS (FORMER STUDENT)," plaintiff claimed that the employees concealed discriminatory misconduct, by attempting to link his 1997 expulsion with the previous death of a student.  *See* Plaintiff's Letter (June 9, 2005) (docket no. 16 at pp. ID# 210-12).  Threatened to file "a massive federal civil rights action" against those individuals who did not pay him a monetary settlement.  *Id.*  Plaintiff's letter stated in part:

Dear Sir, Sirs, or Madame:

PLEASE ACCEPT THIS LETTER/PETITION, in lieu of something more formal, pursuant to our U.S. Federal Statutes, 5 U.S.C. § 552(a), et.seq., requesting that Andrews University ("Andrews") upon receipt of this letter, forthwith, mail to Cheyenne E. Greggs any and all college degrees earned by him prior to Andrews University ("Andrews") highly unlawful and unconstitutional dismissal of him from "Andrews" on or about March 20, 1997.

In addition, recently, we [sic] have received incontrovertible evidence, on-going, that "Andrews" prior racially motivated and/or unlawful discriminatory decision, determination and/or dismissal letter, dated on or about March 19, 1997, then adverse to Mr. Cheyenne Greggs, all, then was predicated on Andrews University's staff/employees having then acted individually and/or collectively, under color of law, in their official and/or unofficial capacities, via an invidious discriminatory animus, class based, against black men, to use Cheyenne Greggs, as a "scape goat" to cover-up the then, on campus, murder of a white "Andrews" student named Kenneth Edward Bame.  A senseless murder (and/or cover-up), mind you, that had been carried out then by several "other" white individuals.

This vicious crime, which consisted of sheer circumstantial evidence against said white individuals (and a crime then not labeled as a homicide) caused

"Andrews" officials then to think about the choice of having the police go out and arrest a few whites based upon the sole non-eye witness testimony/information of a Black man (Cheyenne E. Greggs), thus, risking the embarrassing situation for the wealthy alumni/faculty of "Andrews" should said whites [sic] arrestees, ultimately, be found not guilty, or, alternately, that "Andrews" then do nothing for a few years, or more, until things cool down and, thus, whereas in this case, simply, get rid of the problem (i.e:, Cheyenne E. Greggs) by, pretextually, expelling (in the then future) the above named black man on trumped up false, misleading and/or fraudulent charges of sexual harassment of another "Andrews" student.

*      *      *

Accordingly, the false and fraudulent charges then had to have the ring of believability and/or a ring of an unusual falsehood (at least at that particular time) against a religious Blackman [sic] and, thus, "Andrews," less than four (4) years later after all of the talk of the murder of Kenneth E. Bame had somehow subsided, chose then to concoct the filing of several blatantly false, fraudulent, and highly misleading sexual harassment charges that involved another male student (i.e., a black male student) against Cheyenne E. Greggs (also black).

Based upon "Andrew's" March 19, 1997 filing of its final "overt act" (on-going) in their then unlawful conspiracy, i.e., the "'high- tech" lynching of Mr. Cheyenne E. Greggs, we hereby and hereinafter claim that "Andrew's" racially motivated actions, all, violated Cheyenne E. Greggs fundamentally guaranteed state and federal constitutional rights to due process of law, equal protection of the law, equal rights under the law and, his state and federal constitutional rights to confront the witnesses against him and his right not to be egregiously discriminated against when he then chose, whereas as here, to exercise said guaranteed fundamental federal constitutional rights.  U.C. Const. Amend. 1st 5th 6th 8th 9th 13th and 14th (also, 42 U.S.C.§§ 1981 and 1982; also see, 42 U.S.C.§§§ 1985(2)(3) [sic]; 1983; 1986; also see, Title VI, of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, et. seq,, and that said actions were predicated on fraudulent concealment.

*      *      *

In sum, upon receipt of this omnibus application, please respond within ten (10) business days in writing as to whether or not you individually, and/or collectively, intend to follow federal law, under 5 U.S.C. 552, et. seq., and/or, alternately, forthwith forward any and all college degrees earned by Cheyenne E. Greggs during his studies at Andrews University.  Further, as to "Andrews" University's false allegations of sexual misconduct by Cheyenne E. Greggs, against another individual, we [sic] have been unable to find any evidence whatsoever (i.e., a Police report, a rape kit, a medical opinion, a medical diagnosis, DNA evidence,

7

etc, etc) which suggested that the crime of "rape" (a forced sexually encounter upon another person) actually took place.

Obviously, based upon the above lack of evidence, "Andrews" University is prepared, in the future, to testify (rightly or wrongly) in a Federal Court of law that they are above the law (in today's scientific age of DNA) from proving that "a rape" occurred because (as in 1997) they still believe, today (in 2005), that Cheyenne E. Greggs, was/is nothing more than a "NIGGER" and, thus, the only "DNA" evidence that "Andrews" University needs when they want to expel an Black Man is to simply say to those that practice racial discrimination or bigotry is: Those _D_am _N_iggers _A_lways (**D.N.A.**) doing something wrong!

Finally, should any party named herein wish to settle this case, monetarily, prior to our commencement of a massive federal civil rights action, in excess of seventy five (75) thousand dollars, per Federal Court Rules, please feel free to contact the undersigned at the address listed below:

*Id.* (emphasis in original).

On December 17, 2012, more 7 years after he sent the letter to Andrews University employees, plaintiff filed the present federal action in the United States District Court for the Northern District of New York (the "Northern District of New York"). *See* Compl. (docket no. 1).[1] Plaintiff's original complaint named Andrews University and nine individual defendants, including "John Doe, or Jane Doe, Pastor, of Mount Carmel Seventh-Day-Adventist-Church, Syracuse, N.Y." *See* Compl. (docket no.1 at p. ID# 3). Doe was the only defendant residing in the State of New York. *Id.* Judge Norman A. Mordue allowed plaintiff to proceed *in forma pauperis*, dismissed the Doe defendant with prejudice, and allowed plaintiff to amend his complaint three times. *See*

---

[1] In an apparent attempt to engage in forum shopping, plaintiff tried to file a similar complaint in this Court on December 18, 2012. However, the complaint was rejected because plaintiff neither paid the filing fee nor completed an affidavit of financial status. *See* 1:12-mc-2012 (W.D. Mich.) (Order Rejecting Pleading and attachment) (docket nos. 118 and 118-1). In a subsequent letter directed to the Court, plaintiff acknowledged that he had filed the complaint in New York and wanted to file it in this Court, "because a majority of the [defendants] reside in Michigan." *Id.* (Order Rejecting Pleading and attachment) (docket nos. 121 and 121-1). The latter order was returned to the Clerk's Office because plaintiff had provided the Court with an undeliverable address in Syracuse, New York. *Id.* (Returned Mail) (docket no. 122).

Memorandum - Decision and Order (docket no. 7); Amended Complaints (docket nos. 10, 13 and 16).

The third amended complaint, which is now before the Court, named as defendants Andrews University, the Andrews University Campus Police (which plaintiff's identified as "State Actors and/or State Officials"), and nine individuals.   Seven of the individual defendants were past or present employers of Andrews University: Neils-Erik Andreasen (president and a member of the sexual harassment committee ("SHC")); Newton Hoilette (vice president for students and a member of the SHC; Nancy Carbonell, Ph.D. (sexual harassment compliance officer and chairperson of the SHC); Dr. Glenda-Mae Green (assistant vice president of student services); Spencer Carter (assistant dean of men); Dean Vincent David (dean of men's student dormitory); and Gary Ross (director of student housing.  The remaining two defendants are Paul Flyger (a former graduate student assistant teacher and the accused rapist) and Dexter Saddler (a former student and the alleged rape victim. Third Amend. Compl. (docket no. 16 at p. ID# 182).[2]  Andrews University is the only defendant that has been served in this action.

United States Magistrate Judge Therese Wiley Dancks of the Northern District of New York summarized the allegations set forth in plaintiff's third amended complaint:

> Plaintiff, an African American, was a graduate student at Defendant Andrews University ("University") in Berrien Springs, Michigan in September of 1996 when, according to Plaintiff, Defendant administrators at the University learned of his intent to expose homosexuality at the University.  Fearing scandal, Defendants held a meeting at which they allegedly came up with a plan to recruit gay students and faculty to assist in illegally expelling Plaintiff from the University as soon as possible. (Dkt. No. 16 at ¶¶ 9-12.)  Defendant Dean Vincent David admonished the others that Plaintiff was African American and the University had never expelled a white student or faculty member for being gay.  *Id.* ¶ 15.

---

[2] The Court notes that plaintiff entitled this pleading "Corrected Amended Complaint."

Plaintiff claims that Defendants met again in November of 1996 and, conceding that they had no evidence to support expelling Plaintiff, agreed to recruit gay white students and faculty to assist with filing false homosexual rape charges against Plaintiff.  *Id.* at ¶¶ 18-19.  Later that month, the Defendant University administrators met with white University students Defendant Dexter Saddler ("Saddler") and Paul Flyger ("Flyger") and threatened them with expulsion for homosexual activities unless they agreed to file a false homosexual rape charge against Plaintiff.  *Id.* at ¶ 19.  If they agreed, the University would not file charges against them and would let them stay at the University and graduate.  *Id.*  Plaintiff claims that both Saddler and Flyger agreed, and that in January of 1997, Saddler falsely accused Plaintiff of raping him in August of 1996.  *Id.* at ¶ 21.  Defendant administrators contacted the local police with the intent of having the police arrest Plaintiff on the false rape charges so as to lend credibility to the University's attempt to expel him.  *Id.* at ¶¶ 23.  Defendant administrators concealed from the police the fact that it was actually Defendant Flyger who had raped Saddler.  *Id.* at ¶ 25.  Nothing came of the police investigation.  *Id.* at ¶ 26.

In January of 1997, Defendant Nancy Carbonell ("Carbonell"), Sexual Harassment Compliance Officer and Chair of the University's Sexual Harassment Committee, allegedly uncovered documentary evidence establishing that Flyger was the sole participant in the rape of Saddler and excluding Plaintiff from involvement in the rape.  *Id.* at ¶ 28.  Plaintiff claims that a month later Defendant administrators, as the result of a discriminatory class-based animus, fraudulently concealed information from Plaintiff of prior homosexual conduct by Flyger.  *Id.* at ¶ 29.

In a February 13, 1997, letter, Defendant Newton W. Hoilette ("Hoilette"), Vice-President for Student Services at the University, informed Plaintiff that Saddler and Flyger had implicated him as being involved in the circumstances surrounding Saddler's rape claim against Flyger.  *Id.* at 22.  Defendant Carbonell also wrote to Plaintiff informing him that pursuant to University policy, the Sexual Harassment Committee had been instructed to conduct a thorough investigation of Saddler's December 20, 1996, complaint accusing Plaintiff of sexually harassing him.  *Id.* at 23.  Plaintiff's presence was requested at a meeting of the Committee being held to discuss the complaint, and Plaintiff was invited to review the complaint before the meeting.  *Id.*

On March 19, 1997, following the meeting, the Sexual Harassment Committee issued a letter to Plaintiff stating that Hoilette had appointed the Sexual Harassment Committee to investigate Saddler's complaint that he had been raped by Flyger and Plaintiff.  According to Hoilette, the investigation was done under the formal procedure set forth in the Andrews University Policy Handbook, policy #3:273:5:3.  *Id.* at 24.  The letter included the findings of the Committee that: "1) Dexter Saddler indeed was a victim of unwelcome sexual advances and unwelcome sexual demands for an intimate physical encounter forced on him by both Paul

Flyger and Cheyenne Greggs. 2) Dexter Saddler was the victim, Paul Flyger the aggressor, and Cheyenne Greggs not only a participant, but also a facilitator and orchestrator of the first incident which reportedly took place sometime in August of 1996." *Id.* Hoilette wrote to Plaintiff on March 19, 1997, informing him that the President of the University had accepted the findings of the Committee and that Plaintiff was being dismissed from the University effective March 20, 1997. *Id.* at 25. According to Plaintiff, white students accused of homosexual conduct were able to avoid being formally charged and were able to receive their degrees from the University. *Id.* at ¶ 47.

Plaintiff claims that he did not learn until Christmas of 2010, when he received an anonymous letter from University employees, that the procedure that had been followed with regard to the sexual harassment claim asserted against him, University policy #3:273:5:3, was only for employees accused of sexual harassment, not students. *Id.* at 1. Plaintiff contends that Defendants knew that the procedure was intended only for employees and fraudulently concealed that information from him, thereby preventing him from asserting a timely claim against them. *Id.* at 18-19.

Order (docket no. 20 at pp. ID# 259-61).

Magistrate Judge Dancks summarized plaintiff's claims as follows:

In his original Complaint, Plaintiff asserted claims against Defendants under 42 U.S.C. §§ 1981, 1982, 1983, and 1985, arising out of sexual harassment charges brought against him, which resulted in his expulsion from the University. (Dkt. No. 1 at p. 2, n.1.) In his [Third] Amended Complaint, Plaintiff has omitted his claim under § 1983 but continues to pursue claims under the other provisions, asserting that he has been deprived of his rights under the First, Fifth, Ninth, Thirteenth, and Fourteenth Amendments to the Constitution. (Dkt. No. 16 at p. 2.) Plaintiff may also intend to assert a state law claim for fraud against Defendants as he did in his original Complaint.

*Id.* at p. ID# 262.

Magistrate Judge Dancks noted that since the dismissal of the Doe defendant, the sole connection that the lawsuit had to the Northern District of New York was plaintiff, who resided in Syracuse, New York. *Id.* at pp. ID# 262-63. The magistrate judge further noted that nothing alleged in the third amended complaint suggested that defendants resided in the Northern District of New York, but that the incident out of which plaintiff's claims arose took place entirely in Berrien

11

Springs, Michigan, which is located in the Western District of Michigan, Southern Division. *Id.*
Accordingly, Magistrate Judge Dancks transferred plaintiff's case to this District. *Id.* at p. ID# 264.

## II.     Andrews University's Motion to dismiss

### A.     Legal Standard

Andrews University seeks dismissal of plaintiff's complaint pursuant to Fed. R. Civ.
P. 12(b)(6) on the ground that plaintiff's claim is barred by the statute of limitations and the doctrine
of res judicata. A motion brought pursuant to Fed. R. Civ. P. 12(b)(6) seeks to dismiss a complaint
for "failure to state a claim upon which relief can be granted."

> To survive a motion to dismiss, a complaint must contain sufficient factual
> matter, accepted as true, to "state a claim to relief that is plausible on its face." A
> claim has facial plausibility when the plaintiff pleads factual content that allows the
> court to draw the reasonable inference that the defendant is liable for the misconduct
> alleged. The plausibility standard is not akin to a "probability requirement," but it
> asks for more than a sheer possibility that a defendant has acted unlawfully. Where
> a complaint pleads facts that are "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

In making this determination, the complaint must be construed in the light most
favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Churchs
Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). "When a court is presented with a Rule 12(b)(6)
motion, it may consider the Complaint and any exhibits attached thereto, public records, items
appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long
as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v.
National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).

In addition, it is well established that "*pro se* complaints are held to 'less stringent
standards than formal pleadings drafted by lawyers.'" *Kent v. Johnson*, 821 F.2d 1220, 1223 (6th

12

Cir. 1987), quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972). However, the duty to be "less stringent" with *pro se* complaints does not require this court to conjure up unpled allegations. *McDonald v. Hall*, 610 F.2d 16, 19 (lst Cir. l979). Nor can a court rewrite a complaint to include claims that were never presented. *Rogers v. Detroit Police Deptartment*, 595 F. Supp.2d 757, 766 (E.D. Mich. 2009). To hold otherwise would require the court to explore all potential claims of a *pro se* plaintiff and transform the district court to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party. *Id.*

### B.  Statute of limitations

### 1.  Legal standard

Andrews University seeks to dismiss plaintiff's federal and state claims as untimely.[3] "[A] motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Cataldo v. United States Steel Corporation*, 676 F.3d 542, 547 (6th Cir. 2012). However, if "the allegations in the complaint affirmatively show that the claim is time-barred . . . dismissing the claim under Rule 12(b)(6) is appropriate." *Id.*, citing *Jones v. Bock*, 549 U.S. 199, 215 (2007) ("If the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim[.]"). *See also*, *Whitaker v. Stamping*, -- F.R.D. --, 2014 WL 3846024 at *2 (E.D. Mich. Aug. 5, 2014) ("[d]ismissal under Rule 12(b)(6) is proper when the applicable statute of limitations bars the claim"), citing *Jones v. Bock*, 549 U.S. at 215. Here, the

---

[3] In its reply, Andrews University points out that plaintiff's response is untimely, being filed more than three months late.

allegations of plaintiff's complaint, including the attached documents, show that relief is barred by the applicable statutes of limitations.

### 2. Plaintiff's federal claims

Andrews University does not address the statutes of limitations for the federal claims alleged in the third amended complaint brought pursuant to 42 U.S.C. § 1981 ("Equal rights under the law"), 42 U.S.C. § 1982 ("Property rights of citizens"), and 42 U.S.C. § 1985 ("Conspiracy to interfere with civil rights"). The limitations for plaintiff's federal claims are either three or four years. Claims under §§ 1982 and 1985 borrow the applicable state statute of limitations. *See Dotson v. Lane*, 360 Fed.Appx. 617, 620 n. 2 (6th Cir. 2010); *Bygrave v. Van Reken*, No. 99–1702, 2000 WL 1769587 at *2 (6th Cir. Nov.14, 2000); *Patton v. Village of Cassopolis*, No. 1:13-cv-124, 2013 WL 3929989 at *2 (W.D. Mich. July 29, 2013). A claim arising under § 1982 brought in Michigan has a statute of limitations period of three years. *Bygrave*, 2000 WL 1769587 at *2; *Patton*, 2013 WL 3929989 at *2. Similarly, a claim arising from § 1982 brought in Michigan has a statute of limitations period of three years. *See Hall v. Tolstedt*, No. 09-11694, 2010 WL 481390 at *2 (E.D. Mich. Feb. 5, 2010). Finally, "[a] four-year statute of limitations applies to claims made pursuant to section 1981." *Grain v. Trinity Health*, 431 Fed. Appx. 434, 449 (6th Cir. 2011), citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382-84 (2004) and 28 U.S.C. § 1658.[4]

Andrews University relies on Michigan's accrual statute, M.C.L. § 600.5827, as the basis for its motion to dismiss plaintiff's federal claims. Andrews University's reliance on this state statute is in error. The date when a cause of action for a federal civil rights violation accrues "is a

---

[4] 28 U.S.C. § 1658(a) provides that "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."

14

question of federal law that is *not* resolved by reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (involving a claim under 42 U.S.C. § 1983) (emphasis in original). Rather, "the statute of limitations begins to run when the plaintiff knows or has reason to know of the injury which is the basis of his action and that a plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *McCune v. City of Grand Rapids*, 842 F.2d 903, 905 (6th Cir. 1988). *See Arauz v. Bell*, 307 Fed. Appx. 923, 927-28 (6th Cir. 2009) (quoting *McCune*). As the Supreme Court explained in *Wallace*:

> Under the traditional rule of accrual. . . the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages. The cause of action accrues even though the full extent of the injury is not then known or predictable. Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief.

*Wallace*, 594 U.S. at 391 (internal quotation marks and citations omitted).

Despite Andrews University's failure to identify the applicable statutes of limitations, the Court concludes that plaintiff's claims are time barred. In an effort to explain why it took him so many years to file this federal action, plaintiff alleged that although he was expelled from Andrews University in 1997, his action did not accrue until December 20, 2010, when he received a letter from an anonymous University employee which made him aware of the fact that the University used the wrong policy to expel him. In his third amended complaint, plaintiff alleged that he spent nearly 1 1/2 decades attempting to discover the "mysterious" policy which Andrews University used to expel him:

> Plaintiff's Civil Action, filed under the Federal Discovery Rule, is based on his discovery ("actual notice") on **December 20, 2010**, that numerous Andrews University (A.U.) Employees, in 1996-1997, <u>on-going</u>, had unlawfully conspired with each other, and/or with *others*, to unlawfully and via retaliation, expel him from A.U., (a black student) by filing false charges of homosexual rape, against him, due

15

to his then prior threats to expose homosexual activity, at AU, by "white" students and/or by "'white" faculty members.  After being unlawfully expelled then, Plaintiff spent the last 16 years exercising reasonable care and/or diligence trying to find sufficient information about AU.'s *mysterious* Policy #3:273:5:3, that A.U., then had used to fraudulently expel him.  Unfortunately, **15-16** years had to elapse *before* any A.U., employee(s), would send Plaintiff an anonymous letter, Christmas of 2010, supra, apparently by divine intervention, with a copy of said Policy, above, which was AU's Employer-Employee Policy for EMPLOYEES, *ONLY*, NOT a policy for use against students.  Due to AU.'s wrongful concealment of their policy, Plaintiff claims that he could not have discovered the nature of his claims (i.e., fraud and/or fraudulent concealment) within the limitation period *until* he had received *actual notice* (storm warnings) of the mysterious policy, supra, and material misrepresentations then known by A.U, to be false, when they, in 1996-97, unlawfully then used said policy falsely charge Plaintiff and then, thereby, unconstitutionally expel him from AU.

Third Amend. Compl. (docket no. 16 at p. ID# 180) (footnote omitted) (emphasis in original).

   While plaintiff alleged that he was unaware of the policy at issue until December 20, 2010, plaintiff's allegation is contradicted by his December 17, 2009 letter to Andrews University which stated in pertinent part that prior to sending the letter, he had obtained copies of policy #2:273:5:3 and #3:273:5:3, both of which he identified as part of *Andrews University's Employer-Employee Handbook*.  *See* Letter (Dec. 17, 2009) (docket no. 1 at pp. ID# 26).  Noticeably absent from the Court record is a copy of the 2010 anonymous letter from an Andrews University employee which forms the basis of plaintiff's fraudulent concealment claim.

   Plaintiff's explanation for waiting nearly 15 years to file this action is frivolous because he knew of the existence of the allegedly concealed policy as early as 1997.  In a letter dated February 13, 1997, defendant Carbonell advised plaintiff that on December 20, 1996, Dexter Saddler filed a complaint accusing plaintiff of sexually harassing him and that "[a]ccording to Andrews University Policy #2:273:5:3 the Sexual Harassment Committee is instructed to conduct a thorough investigation of any complaint filed with the Sexual Harassment Compliance Officer."  Letter (Feb.

13, 1997) (docket no. 16 at p. ID# 202).  According to defendant, Carbonell's incorrect reference

to policy #2:273:5:3 rather than #3:273:5:3 was a typographical error.  Defendant's Brief (docket

no.  27 at p. ID# 304).  Assuming, for purposes of this motion, that this letter misinformed plaintiff

as to the policy at issue, a subsequent letter dated March 19, 1997 from the SHC to plaintiff included

the correct citation.  In this letter, the SHC stated that it was appointed to investigate the complaint

against plaintiff "according to the formal procedure outlined in the Andrews University Policy

Handbook, policy #3:273:5:3."  Letter (March 19, 1997) (docket no. 16 at p. ID# 203).  Plaintiff

does not claim that he failed to receive these letters which were addressed to him.  On the contrary,

plaintiff acknowledged that he received the March 19, 1997 letter, in which plaintiff was told "that

he orchestrated and facilitated a rape against Dexter R. Saddler."  *See* Plaintiff's Response at ¶ 6 and

Exhibit G (docket nos. 29 and 29-7); Third Amend. Compl. at fn 1 (docket no. 16 at p. ID# 180)

("Noteworthy is that, no where could I find in Defendants two accusatory letters, dated February 13,

1997, and March 19, 1997, copies of Defendants' policy #3.273:5:3") (emphasis in original).

Despite the fact that plaintiff was advised in 1997 that he was found to be a facilitator and

orchestrator of unwelcome sexual advances and unwelcome sexual demands pursuant to policy #

3:273:5:3, plaintiff now alleges that he "never had any knowledge, whatsoever, that said policy

existed."  Third Amend. Compl. at ¶ 30.

Any doubt that plaintiff was aware of this policy was laid to rest on March 27, 2003,

when the Michigan Court of Appeals issued its opinion affirming the dismissal of plaintiff's Berrien

County Circuit Court case.  In that opinion, the appellate court explicitly discussed the policy,

stating that "Dr. Hoilette appointed this Sexual Harassment Committee to investigate the complaint

**according to the formal procedure outlined in the Andrews University Policy Handbook,**

**policy # 3:273:5:3**.”  *Greggs*, 2003 WL 1689619 at *2 (emphasis added).  Contrary to plaintiff's allegations, this policy was part of the state court proceedings during which it was neither concealed nor a “mystery.”

The record reflects that plaintiff has been aware that Andrews University followed policy #3:273:5:3 since on or about March 19, 1997.  While Andrews University may not have sent him a copy of the policy in 1997, plaintiff was aware of the policy and could have investigated it at that time.  Furthermore, this policy was an integral part of plaintiff's appeal, which the Michigan Court of Appeals explicitly identified in its March 27, 2003 opinion.  From that date forward, he could have reviewed the policy and determined, as he now alleges, that the policy was directed only to employees and not to students at the University.  Stated differently, by the time that plaintiff's appeal was decided, plaintiff knew that the University used policy #3:273:5:3 and “through the exercise of reasonable diligence” should have discovered his injury, i.e., that the University allegedly used the wrong policy.  *See McCune*, 842 F.2d at 905.  Based on this record, plaintiff's cause of action accrued no later than March 27, 2003, when the Michigan Court of Appeals explicitly identified policy #3:273:5:3 as the procedure applicable to plaintiff's expulsion. *See Wallace*, 549 U.S. at 388, 391; *Arauz*, 307 Fed. Appx. at 927-28;  *McCune*, 842 F.2d at 905.  Given that plaintiff's cause of action accrued by no later than March 27, 2003, his claims brought under §§ 1982 and 1985 should have been filed no later than March 27, 2006 and his claim brought under § 1981 should have been filed no later than March 27, 2007.  Plaintiff's federal claims filed in December 2012 are untimely and barred by the applicable statutes of limitation.  Accordingly, Andrews University's motion to dismiss plaintiff's action should be granted as to all federal claims.

### 3.     Plaintiff's state law fraud claim

In evaluating the third amended complaint, Magistrate Judge Dancks concluded that plaintiff "may also intend to assert a state law claim for fraud against Defendants."  Order (Oct. 8, 2013) (docket no. 20 at p. ID# 262).  However, Magistrate Judge Dancks did not address the fraud claim in any detail.  Similarly, Andrews University has provided no guidance to the Court on the legal basis for plaintiff's fraud allegations.  Michigan law recognizes three interrelated fraud doctrines: (1) fraudulent misrepresentation (also known as actionable fraud or traditional common-law fraud); (2) innocent misrepresentation; and (3) silent fraud (also known as fraudulent concealment).  *Titan Insurance Co. v. Hyten*, 491 Mich. 547, 555, 817 N.W.2d 562 (2012).  Each theory of fraud contains distinct elements.  *Id.*  To the extent that plaintiff has alleged fraud, it would be silent fraud or fraudulent concealment.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

> To prove silent fraud, also known as fraudulent concealment, the plaintiff must show that the defendant suppressed the truth with the intent to defraud the plaintiff and that the defendant had a legal or equitable duty of disclosure.  *Roberts v. Saffell*, 280 Mich.App. 397, 403-404, 760 N.W.2d 715 (2008), aff'd 483 Mich. 1089, 766 N.W.2d 288 (2009).  A plaintiff cannot merely prove that the defendant failed to disclose something; instead, "a plaintiff must show some type of representation by words or actions that was false or misleading and was intended to deceive."  *Id.* at 404, 760 N.W.2d 715.

*Lucas v. Awaad*, 299 Mich.App. 345, 363-64, 830 N.W.2d 141 (2013).

Here, plaintiff alleged that defendants fraudulently concealed the policy by failing to advise him of the nature of policy #3:273:5:3 since his expulsion in 1997.  Plaintiff has alleged that defendants sent him a number of letters which concealed the fact that he was expelled under an policy regulating employees rather than a policy regulating students.  *See* Third Amend. Compl. at

19

¶¶ 31-70.  As discussed, *supra.*, plaintiff's allegations of fraudulent concealment are contradicted

by documents attached to the third amended complaint.  Specifically, the March 19, 1997 letter

explicitly advised plaintiff that Andrews University was proceeding under policy #3:273:5:3.

In addressing the statute of limitations for fraud claims in Michigan, the Sixth Circuit

observed that:

> Under Michigan law, "the period of limitations runs from the time the claim
> accrues," which is generally "the time the wrong upon which the claim is based was
> done."  Mich. Comp. Laws § 600.5827.  Often in case of fraud, however, although
> the damage is done, the putative plaintiff is unaware of her cause of action because
> the perpetrators subsequently conceal the crime.  In cases where there has been
> fraudulent concealment, "the action may be commenced at any time within 2 years
> after the person who is entitled to bring the action discovers, or should have
> discovered, the existence of the claim or the identity of the person who is liable for
> the claim."  Mich. Comp. Laws § 600.5855.  Where there is no subsequent
> concealment to hide the fraud, the limitation period for fraud is six years.  *Boyle v.
> Gen. Motors Corp.*, 468 Mich. 226, 661 N.W.2d 557, 560 (2003);  Mich. Comp.
> Laws § 600.5813. The discovery rule, absent concealment, does not apply to the
> accrual of actions for fraud in Michigan.  *Boyle*, 661 N.W.2d at 560.

*Computer Leasco, Inc. v. NTP, Inc.*, 194 Fed.Appx. 328, 340 (6th Cir. 2006).[5]

---

[5] M.C.L. § 600.5855 ("Fraudulent concealment of claim or identity of person liable, discovery")
provides as follows:

> If a person who is or may be liable for any claim fraudulently conceals the existence
> of the claim or the identity of any person who is liable for the claim from the knowledge of
> the person entitled to sue on the claim, the action may be commenced at any time within 2
> years after the person who is entitled to bring the action discovers, or should have
> discovered, the existence of the claim or the identity of the person who is liable for the claim,
> although the action would otherwise be barred by the period of limitations.

M.C.L. § 600.5827 ("Accrual of claim; general rule") provides as follows:

> Except as otherwise expressly provided, the period of limitations runs from the time
> the claim accrues.  The claim accrues at the time provided in sections 5829 to 5838, and in
> cases not covered by these sections the claim accrues at the time the wrong upon which the
> claim is based was done regardless of the time when damage results. [Footnote omitted.]

Assuming, for purposes of defendant's motion to dismiss, that plaintiff's third amended complaint properly alleged a fraudulent concealment claim in the specificity required by Fed. R. Civ. P. 9(b), plaintiff had to commence such a fraud action no later than March 27, 2005, two years after March 27, 2003, the latest possible date that he "should have discovered, the existence of the claim." Mich. Comp. Laws § 600.5855; *Computer Leasco, Inc.*, 194 Fed.Appx. at 340. Plaintiff's state law fraud claim (if such an action exists) would be barred by the applicable statutes of limitation because he did not file this action until December 17, 2012.

For all these reasons, Andrews University's motion to dismiss plaintiff's state law fraud action should be granted.

## C.     Res Judicata

Andrews University also seeks to dismiss plaintiff's action for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) on grounds of res judicata. "Pursuant to the doctrine of res judicata, 'a final judgment on the merits bars further claims by parties or their privies based on the same cause of action.'" *Bragg v. Flint Board of Education*, 570 F.3d 775, 776 (6th Cir. 2009), quoting *Montana v. United States*, 440 U.S. 147, 153(1979) (citations omitted). "Federal courts must give the same preclusive effect to a state-court judgment as that judgment receives in the rendering state." *Abbott v. Michigan*, 474 F.3d 324, 330 (6th Cir.2007) (citing 28 U.S.C. § 1738). The Sixth Circuit has observed that Michigan employs a "broad view of res judicata." *Buck*, 597 F.3d at 817, quoting *In re MCI Telecommunications Complaint*, 460 Mich. 396, 431, 596 N.W.2d 164, 183 (1999). In Michigan, res judicata "bars a second, subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Buck*, 597 F.3d at 817.

21

Finally, under Michigan law, "the burden of proving the applicability of the doctrine of res judicata is on the party asserting it." *Abbott*, 474 F.3d at 331, quoting *Baraga County v. State Tax Commission*, 466 Mich. 264, 269, 645 N.W.2d 13 (2002).

Here, Andrews University has failed to meet its burden demonstrating that plaintiff's claims are barred by res judicata. *See Abbott*, 474 F.3d at 331. The present action involves ten defendants: Andrews University; the Andrews University Campus Police; and eight individuals. While Andrews University points to the previous litigation in Michigan's 5th District Court and the Berrien County Circuit Court as the basis for applying res judicata, the previous litigation involved only plaintiff and the University. The remaining nine defendants were not parties to the state court litigation. *See* Exhibits A and B (docket nos. 27-1 and 27-2). While plaintiff's present litigation arises from the same occurrence as the previous litigation, i.e., plaintiff's expulsion from the Andrews University in1997, the University has not shown that this is a subsequent action between the same parties or their privies. *See Buck*, 597 F.3d at 817.

In *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich.App. 1, 672 N.W.2d 351 (2003), the Michigan Court of Appeals explained the concept of a party's "privy" for purposes of applying res judicata:

> The parties to the second action need be only substantially identical to the parties in the first action, in that the rule applies to both parties and their privies. *In re Humphrey Estate*, 141 Mich.App. 412, 434, 367 N.W.2d 873 (1985). Regarding private parties, a privy includes a person so identified in interest with another that he represents the same legal right, such as a principal to an agent, a master to a servant, or an indemnitor to an indemnitee. *Viele v. DCMA*, 167 Mich.App. 571, 580, 423 N.W.2d 270, mod. 431 Mich. 898, 432 N.W.2d 171 (1988), on remand 211 Mich.App. 458, 536 N.W.2d 276 (1995). A privy includes one who, after rendition of the judgment, has acquired an interest in the subject matter affected by the judgment through one of the parties, as by inheritance, succession, or purchase. *Wildfong v. Fireman's Fund Ins. Co.*, 181 Mich.App. 110, 115, 448 N.W.2d 722 (1989). In order to find privity between a party and a nonparty, Michigan courts

22

require "both a substantial identity of interests and a working or functional relationship. . . in which the interests of the non-party are presented and protected by the party in the litigation." *Phinisee v. Rogers*, 229 Mich.App. 547, 553-554, 582 N.W.2d 852 (1998) (internal quotations omitted).

*Peterson Novelties, Inc.*, 259 Mich.App. at 12-13.

Here, it is conceivable that there is a substantial identity of interests and a functional relationship between defendant Andrews University, its Campus Police, and its employees (or former employees) involved in plaintiff's expulsion sufficient to consider these new defendants as privies of Andrews University.   However, a different relationship exists between Andrews University and defendants Paul Flyger and Dexter Saddler.  Plaintiff identified Flyger as a "graduate assistant teacher" (presumably an employee of Andrews University), as well as student at the University and the alleged "rapist."   While Flyger may be a privy of the University due to his employment relationship, his interests differ from the University because he was also a student and the alleged rapist.   Under these circumstances, the Court does not consider Flyger to have a substantial identity of interests with Andrews University.  Finally, Saddler was not an Andrews University employee, but rather a student, like plaintiff, and the rape victim who filed a complaint with the University.  *See* Letters (docket no. 16 at pp. ID# 201-03).  Given plaintiff's allegations, the Court does not find that either Flyger or Saddler were "privies" of Anderson University for purposes of applying res judicata.  Accordingly, Andrews University's motion to dismiss plaintiff's action on grounds of res judicata should be denied.

## III.    Unserved defendants

As discussed, plaintiff has not served any of the individual defendants or the Andrews University Campus Police.  Because plaintiff's action is barred by the applicable statutes of limitations, it would be both a futile gesture and an uneconomical use of judicial resources to

conduct further proceedings against the unserved defendants.  "[N]o principle forbids a court to notice that [] a defense exists, is bound to be raised, and is certain to succeed when raised." *Buckley v. Fitzsimmons*, 20 F.3d 789, 793 (7th Cir.1994).  *See, e.g., Moore v. Thomas*, 653 F.Supp.2d 984, 1003 (N.D. Cal. 2009) ("[s]ummary judgment may be properly entered in favor of unserved defendants where (1) the controlling issues would be the same as to the unserved defendants, (2) those issues have been briefed, and (3) [p]laintiff has been provided an opportunity to address the controlling issues" ).  *See also, Laubach v. Scibana*, No. CIV-05-1294-F, 2008 WL 281545 at *12 (W.D. Okla. Jan. 31, 2008) (meritorious affirmative defenses asserted by defendants were "equally applicable to the claims against the unresponsive and unserved defendants" and formed the basis to dismiss the unserved defendants pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii)); *Blake v. McCormick*, No. 5:06-cv-273, 2007 WL 1671732 at *5 (E.D. Tex. June 8, 2007)  (a successful affirmative defense of lack of exhaustion raised by defendants served in a prisoner civil rights case "inures to the benefit of any unserved or defaulting defendants"); *Day v. Office of Cook County Sheriff*, No. 2000 C 2529, 2001 WL 561362 at *3 (N.D. Ill. May 21, 2001) (defendant's meritorious defense of qualified immunity applied to other "yet-unserved defendants" who could raise the same defense).  *Cf.  Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001) ("[s]everal courts have held that where 'a defending party establishes that plaintiff has no cause of action . . .  this defense generally inures also to the benefit of a defaulting defendant'"), quoting *United States v. Peerless Insurance Company*, 374 F.2d 942, 945 (4th Cir. 1967).

Andrews University and plaintiff have fully briefed the issues related the statute of limitations and res judicata.  Based on this record, the undersigned has concluded that Andrews University is entitled to dismissal because plaintiff's claim is barred by the applicable statutes of

limitation for the federal and state claims alleged in his complaint.  The unserved defendants could successfully raise this defense if and when plaintiff served them with a copy of the third amended complaint.  Accordingly, plaintiff's action should be dismissed as to all of the unserved defendants.[6]

### IV.    RECOMMENDATION

For these reasons, I respectfully recommend that defendant Andrew University's motion to dismiss (docket no. 26) be **GRANTED** and that this action be **DISMISSED**.


Dated:  February 9, 2015                              /s/ Hugh W. Brenneman, Jr.
                                                      HUGH W. BRENNEMAN, JR.
                                                      United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

---

[6] Furthermore, for the reasons discussed in this report, the Court could *sua sponte* dismiss plaintiff's *in forma pauperis* action as time barred pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) ("Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that  .  .  .  (B) the action or appeal  .  .  .  (ii) fails to state a claim on which relief may be granted[.]").